Sealed

**FILED by _____ D.C.**

**MAY 1 9 2016**

STEVEN M. LARIMORE
CLERK U. S. DIST. CT.
S. D. of FLA. – MIAMI

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

CASE NO. **16-21816**

CIV-COOKE

UNDER SEAL

In Re:  Request form Brazil Pursuant to the
Treaty Between the Government of the United
States of America and the Government of the
Federative Republic of Brazil on Mutual Legal
Assistance in Criminal Matters in the Matter of
Arturo Jose Sosky Brudner

_____/

## MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR ORDER TO APPOINT COMMISSIONER

The United States is seeking an order appointing a person as a commissioner to collect evidence requested by Brazil in its attached treaty request (the "Request") made pursuant to the Treaty Between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters, U.S.-Braz., Oct. 14, 1997, S. TREATY DOC. NO. 105-42 (1998) (the Treaty), and 18 U.S.C. § 3512.

A.      The Present Request

The Central Authority for Brazil pursuant to Article 2 of the Treaty makes this Request in connection with a criminal investigation.  Specifically, the Ministry of Justice, Department of Assets Recovery, Brazil, is investigating Arturo Jose Sosky Brudner (Brudner) for tax evasion.

According to Brazilian authorities, on January 26, 2005, Brudner admitted to Brazilian authorities that he had a bank account at Lloyds Bank in Miami, Florida, and had failed to report the existence of this account to the Central Bank of Brazil, as required under Brazilian law. Shortly after confessing, Brudner fled Brazil.  Using forensic experts, Brazilian authorities confirmed that Brudner was in fact the registered holder of account number 11030607 and

25016970 at Lloyds Bank in Miami, Florida.   Moreover, Brazilian authorities established that Brudner had opened these accounts in 1997 and that they received deposits every December 31, between 1999 and 2008.

Pursuant to the facts in the Request, the Brazilian authorities asks for assistance in obtaining bank records detailing the account balance of the Lloyds Bank accounts for 1999 through 2008.

Federal courts, pursuant to the Treaty, statute and their inherent authority, may issue orders as may be necessary for the production of the evidence requested by Brazil including orders appointing a person as a commissioner to gather such evidence and establishing the procedures for the production of such evidence.

B.      Authority to Execute the Request

1.      The Treaty

A treaty constitutes the law of the land.   U.S. Constitution Article VI.   The provisions of a treaty have equal footing with acts of Congress and are binding on the courts.   Asakura v. City of Seattle, Washington, 265 U.S. 332, 341 (1924); United States v. The Peggy, 5 U.S. 103 (1801); In re Commissioner's Subpoenas, 325 F.3d 1287, 1291 (11th Cir. 2003).   To the extent that the provisions of a treaty are inconsistent with a preexisting statutory provision, the treaty supersedes the statute.   Zschernig, et al. v. Miller, Administrator, et al., 389 U.S. 429, 440-441 (1968); In re Commissioner's Subpoenas, 325 F.3d 1287, 1305-1306 (11th Cir. 2003); United States v. Erato, 2 F.3d 11, 15-16 (2d Cir. 1993).

The United States and Brazil entered into the Treaty for purposes of "…desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance criminal

matters."   Preamble to the Treaty.   See Letter of Submittal to the President from the Department of State, October 14, 1997.   In accordance with the provisions of the Treaty, each State is obligated to provide mutual assistance to the other in connection with the investigation, prosecution, and prevention of offenses, and proceedings related to criminal matters.   Article 1(1); In re Commissioner's Subpoenas, 325 F.3d 1287, 1290 (11th Cir. 2003).   Each state contemplated that it would provide the other with assistance generally comparable to that which is available to its own law enforcement authorities, which assistance includes taking testimony or statements of persons, providing documents and other evidence, and immobilizing criminally-obtained assets.   Article 1(2); Barr v. U. S. Department of Justice, 645 F. Supp. 235, 237 (E.D.N.Y. 1986), aff'd, 819 F.2d 25 (2d Cir. 1987).

The Treaty and 18 U.S.C. § 3512 empower federal courts to execute treaty requests in order to comply with the United States' treaty obligations and contemplates that federal courts will use compulsory measures to execute such requests.   Article 5(1) provides:

"The Courts of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request. "

The treaty contemplates that the federal courts will use compulsory measures to execute such requests.   Article 8(1) provides:

"A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or items."

The Treaty imposes no dual criminality requirement as a precondition for providing assistance.   Consequently, each state party is obligated to provide assistance without regard to whether the conduct under investigation or prosecution would constitute an offense under the laws of the Requested State, except as otherwise provided by U.S. law.   See page (v), Letter of

Submittal of Treaty to the President, October 14, 1997.

    2.    <u>Statutory Authority Grounding Execution of Requests for Assistance</u>

The Treaty is designed to be self-executing and requires no implementing legislation.   <u>See</u>
page (v), Letter of Submittal of Treaty to the President, October 14, 1997; <u>In re Commissioner's</u>
<u>Subpoenas</u>, 325 F.3d 1287, 1291 (11th Cir. 2003).   However, because the procedural provisions
in many treaties are minimal, in the past federal courts routinely utilized procedures authorized by
28 U.S.C. § 1782 (the "Commissioner" process) to execute treaty requests from foreign authorities.
<u>In re Commissioner's Subpoenas</u>, 325 F.3d 1287, 1305-1306 (11th Cir. 2003).   Substantive U.S.
law regarding searches, seizures and other compulsory processes further grounded the execution
of such assistance requests.

On October 19, 2009, the President signed the Foreign Evidence Request Efficiency Act of
2009 (Public Law 111-79), enacting 18 U.S.C. § 3512, the full text of which is attached for the
convenience of this Court.   Section 3512 explicitly authorizes a federal court to:

> "…issue such orders as may be necessary to execute a request from a
> foreign authority for assistance in the investigation or prosecution of
> criminal offenses, or in proceedings related to the prosecution of criminal
> offenses, including proceedings regarding forfeiture, sentencing, and
> restitution."

Section 3512 directly empowers the federal courts to execute such requests and separately codifies
under Title 18 the longstanding practice and procedures employed by the United States and the
federal courts to execute requests by foreign authorities for assistance to the fullest extent possible
under U.S. law.   Congress enacted Section 3512 to make it "easier for the United States to
respond to these requests by allowing them to be centralized and by putting the process for
handling them within a clear statutory scheme." 155 CONG. REC. S6,810 (2009)(Statement of
Sen. Whitehouse).

C.      Execution of Foreign Requests for Assistance Under the Treaty and Section 3512

      1.      Authorization of the Application to This Court

Section 3512 provides:

"Upon application, duly authorized by an appropriate official of the
Department of Justice, of an Attorney for the Government, a Federal judge
may issue such orders as may be necessary to execute a request from a
foreign authority for assistance in the investigation and prosecution of
criminal offenses, or in proceedings related to the prosecution of criminal
offenses, including proceedings regarding forfeiture, sentencing and
restitution."

For purposes of Section 3512, an application is "duly authorized by an appropriate official of the

Department of Justice" when the Department of Justice, Criminal Division, Office of International

Affairs, has reviewed and authorized the request and is executing the request itself or has delegated

the execution to another attorney for the government.  In this matter, such authorization and

delegation is evidenced by a letter dated May 2, 2016 from the Department of Justice, Criminal

Division, Office of International Affairs, received by the United States Attorney, transmitting the

Request to this district for execution.

      Section 3512(c) authorizes filing the instant application in this district, where the majority

of the evidence is located.

      2.      Foreign Authority Seeking Assistance Within Section 3512 and the Treaty

As to the "foreign authority" making the Request, Section 3512(h) provides:

"The term "foreign authority" means a foreign judicial authority, a foreign
authority responsible for the investigation or prosecution of criminal
offenses or for proceedings related to the prosecution of criminal offenses,
or an authority designated as a competent authority or central authority for
the purpose of making requests for assistance pursuant to an agreement or
treaty with the United States regarding assistance in criminal matters."

In this matter the Ministry of Justice, Department of Assets Recovery, is the designated Central

Authority in Brazil for requests made pursuant to the Treaty.

As evidenced by the Request itself and confirmed in the authorization process and again by the undersigned, consistent with Section 3512(a)(1), the foreign authority seeks assistance in the investigation or prosecution of criminal offenses or in proceedings related to the prosecution of criminal offenses.

      3.     Authority of the Federal Courts Under Section 3512.

When enacting Section 3512, Congress intended that federal courts facilitate to the fullest extent possible the execution of requests by foreign authorities for assistance in criminal matters and endeavored to streamline and expedite the execution of such requests.  Section 3512 authorizes federal courts to issue "such orders as may be necessary to execute a request" and specifically includes:   orders for search warrants pursuant to Federal Rule of Criminal Procedure 41; orders for stored wire or electronic communications and related evidence under 18 U.S.C. § 2703; orders for pen registers and trap and trace devices under 18 U.S.C. § 3123; orders for the provision of testimony or a statement or the production of documents or other things, or both; and orders appointing "a person" to direct the taking of testimony or statements or the production of documents or other things, or both; 18 U.S.C. § 3512(a)(1), (2).

The assistance requested by Brazil pursuant to the Treaty by its Ministry of Justice, Department of Assets Recovery, in the instant Request falls squarely within that contemplated by both the Treaty and Section 3512.

D.     Appointment of a Person as Commissioner to Collect Evidence

      1.     Statutory Authorization.

Section 3512(b) provides that a federal judge may "issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or

both."   The statute further authorizes the person appointed to issue orders, requiring the appearance of a person, the production of documents or other things, or both; administer any necessary oath; and takes testimony or statements and receive documents or other things.

Commensurate with past practice under 28 U.S.C. § 1782, it is anticipated that a federal court would appoint an attorney for the government, typically a federal prosecutor, as "Commissioner."

 2.  Procedures for Evidence Collection

Section 3512(a) specifically empowers a federal judge to issue "such orders as may be necessary" to execute the request.   This authorization encompasses orders specifying the procedures to be used to collect particular evidence, including procedures requested by the foreign authority to facilitate its later use of the evidence.   In executing a request made pursuant to a treaty, a court has the obligation to prescribe effective and expeditious procedures designed to promote the purpose of the treaty.   See In re Commissioner's Subpoenas, 325 F.3d 1287, 1305 (11th Cir. 2003).   Nothing in Section 3512 suggests any limitation on a court's power to exercise "complete discretion in prescribing the procedure to be followed" as was available under 28 U.S.C. § 1782.   In re: Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 693 (D.C. Cir. 1989), citing 1964 U.S.C.C.A.N. at 3789.   See White v. National Football League, et al., 41 F.3d 402, 409 (8th Cir. 1994), cert. denied, 515 U.S. 1137 (1995) (a court may issue whatever process it deems necessary to facilitate disposition of a matter before it); FED.R.CRIM.P. 57(b).

 a.  Procedures Authorized by Other Statutes.

In addition, Section 3512 references specific U.S. laws for obtaining certain evidence and, by doing so, adopts any statutorily mandated procedures in relation to obtaining orders for search

warrants; orders for contents of stored wire or electronic communications or for records related thereto; and orders for a pen register or a trap and trace device.

        b.     Orders by the Person Appointed; Commissioner Subpoenas

      Section 3512 authorizes the "person" appointed (here, and in past practice under 28 U.S.C. § 1782, the "Commissioner") to issue orders "requiring the appearance of a person, or the production of documents or other things or both."   Further, Article 5(1) of the Treaty provides for the issuance of procedural documents, such as subpoenas, to gather evidence:

> "The Courts of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request."

      If a federal district court so orders, the Commissioner may use the attached form, still entitled "Commissioner's Subpoena," to obtain the requested evidence.   See In re: Commissioner's Subpoenas, 325 F.3d 1287, 1291 (2d Cir. 1993) (incorporating in pertinent part a district court's order directing use of commissioner's subpoenas); United States v. Erato, 2 F.3d 11, 13-14 (2d Cir. 1993) (same).   This commissioner's subpoena is simply a version of the "order" to be issued by the person appointed by the Court under Section 3512 to direct the production of evidence. Section 3512 expressly authorizes the service and enforcement of such orders, or commissioner's subpoenas, anywhere in the United States (i.e., coextensive with the service of subpoenas in U.S. criminal investigations and prosecutions).

        c.     Notice of Evidence Taking

      As an initial matter, this application is being made *ex parte*, consistent with U.S. practice in its domestic criminal matters and its prior practice on behalf of foreign authorities under 28 U.S.C. § 1782.   In re: Letter of Request from the Crown Prosecution Service of the United Kingdom, 870 F.2d 686, 688 (D.C. Cir. 1989); In re: Letters Rogatory from the Tokyo District,

Tokyo, Japan, 539 F.2d 1216, 1219 (9th Cir. 1976).   The Treaty itself contemplates the need for

confidentiality with respect to all aspects of the execution of requests. Article 5(5) provides:

> "The Requested State shall use its best efforts to keep confidential a request
> and its contents if such confidentiality is requested by the Central Authority
> of the Requesting State."

Therefore, in accordance with the request by the Central Authority of Brazil, the United

States requests that this Court's Order direct any individual or entity that receives a

Commissioner's Subpoena in this matter to keep confidential the existence of the subpoena, its

content, and the response to the subpoena.

Both Section 3512 and the Treaty at Article 8(1) authorize use of compulsory process in

the execution of treaty requests comparable or similar to that used in domestic criminal

investigations or prosecutions.   Because subpoenas utilized in U.S. criminal proceedings (i.e.,

grand jury and criminal trial subpoenas) are issued without notice to any party other than the

recipients (i.e., no notice to targets or defendants), orders and commissioner's subpoenas issued in

execution of treaty requests pursuant to Section 3512 and the applicable treaty likewise should

require no notice other than to the recipients.   In the absence of a specific request to provide

notice, U.S. authorities can assume that a requesting foreign authority has provided such notice

as the foreign law requires, or that foreign law does not require notice and the requesting foreign

authority does not consider notice to be necessary or useful.   Accordingly, a federal district court

should authorize a commissioner to collect the evidence requested without notice to any party

other than the recipient of the commissioner's subpoena except to the extent that a request asks for

specific notice procedures.

> d.   Right to Financial Privacy Act

The Right to Financial Privacy Act, 12 U.S.C. cc 3401 et seq., does not apply to

execution of foreign legal assistance requests.   Young v. U.S. Dept. of Justice, 882 F.2d 633, 639 (2d Cir. 1989), cert. denied, 493 U.S. 1072 (1990); In re: Letter of Request for Judicial Assistance from the Tribunal Civil de Port-Au-Prince, Republic of Haiti, 669 F. Supp. 403, 407 (S.D. Fla. 1987); In re: Letters of Request from the Supreme Court of Hong Kong, 821 F.Supp. 204, 211 (S.D.N.Y. 1993).   Consequently, to the extent that execution of a request entails production of bank or financial records, notice provisions of the Act do not apply, and the commissioner need not give, nor arrange for the custodian of records to give, notice to an account holder.   (Note that the Act itself applies only to accounts maintained in a person's name and not to corporate, perhaps even partnership, accounts.   United States v. Daccarett, 6 F.3d 37, 50-52 (2d Cir. 1993).)

### Conclusion

The instant Request is exactly the type of request contemplated for execution under Section 3512.   In its sequential legislative efforts relevant to the provision of assistance to foreign authorities, Congress has intended that the United States set an example to other nations by making judicial assistance generously available. See, e.g. In re: Request for Assistance from Ministry of Legal Affairs of Trinidad and Tobago, 848 F.2d 1151, 1153-1154 (11th Cir. 1988), cert. denied, 488 U.S. 1005 (1989).   Section 3512 enables the United States to respond "more quickly . . . to foreign evidence requests.   These efforts will assist the United States with its investigations as foreign authorities will be urged to respond in kind to our evidence requests in a speedy manner." 155 CONG. REC. H10,093 (2009)(Statement of Rep. Schiff).

As to this Request, both the investigatory nature of the Request as described and the intentions of the foreign authority under the Treaty militate that the application and order be maintained under seal.

Accordingly, to execute this Request, the United States moves this Court to issue the attached proposed order pursuant to the Treaty and 18 U.S.C. § 3512 appointing the undersigned Assistant United States Attorney as Commissioner, authorizing the undersigned to take the actions necessary, including the issuance of commissioner's subpoenas, to obtain the evidence requested, to adopt such procedures in receipt of the evidence as are consistent with the intended use thereof in Brazil, and sealing the application and order until further order of this Court.

Wherefore, the United States request that the Court enter the proposed order.


Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

By: _____

Brooke C. Watson
Assistant United States Attorney
Court No. A5501844
99 NE 4th Street, 4th Floor
Miami, FL 33132
Telephone:   (305) 961-9070
Email:   Brooke.Watson@usdoj.gov

Dated: 5\19\16

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. **16 - 21816**

**CIV - COOKE**

In Re:  Request form Brazil Pursuant to the
Treaty Between the Government of the United
States of America and the Government of the
Federative Republic of Brazil on Mutual Legal
Assistance in Criminal Matters in the Matter of
Arturo Jose Sosky Brudner

_____/


**SAMPLE**

**COMMISSIONER'S SUBPOENA**


TO:  _____

      _____


I, Commissioner Brooke C. Watson, an Assistant United States Attorney for the Southern

District of Florida, acting pursuant to the Treaty Between the Government of the United States of

America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in

Criminal Matters, U.S.-Braz., Oct. 14, 1997, S. TREATY DOC. NO. 105-42 (1998), 18 U.S.C. §

3512, and this Court's order thereunder dated _____, for the purpose of rendering

assistance to Brazil, command that you appear before me in Room_____, in the building located at

_____ , in the city of _____ , in the state of

_____ , on _____, 20__,  at _____ AM/PM to provide testimony/documents

regarding an alleged violation of:

the laws of the Republic of Brazil, namely, tax evasion, and among other violations, and that at the place and time aforesaid you provide the following:

**[identify documents etc. to be produced]**

For failure to attend and provide testimony/said documents, or for disclosure of the existence of the subpoena, you may be deemed guilty of contempt and liable to penalties under the law.

_____
Commissioner Brooke C. Watson
Assistant United States Attorney
Court No. A5501844
99 NE 4th Street, 4th Floor
Miami, FL 33132
Telephone:     (305) 961-9070
Email: Brooke.Watson@usdoj.gov

Dated: _____



MINISTRY OF JUSTICE
NATIONAL SECRETARIAT OF JUSTICE
DEPARTMENT OF ASSETS RECOVERY AND INTERNATIONAL LEGAL ASSISTANCE
GENERAL-COORDINATION OF ASSETS RECOVERY

Official Letter # 255/2016/CGRA-DRCI-SNJ-MJ

Brasília, January 11ᵗʰ, 2016.
**-URGENT-**
**-CONFIDENTIAL-**

▮▮▮▮▮▮

Director
Office of International Affairs – Criminal Division
Department of Justice, 13001/IA/CRM
▮▮▮▮▮▮

20530 – Washington D.C.

**Subject: Mutual Legal Assistance in Criminal Matters between Brazil and the United States of America in the matter of Banestado (Arturo José Josky Brudner).**

Our reference: **2015/04441**

Dear Madam,

1. In the capacity of Central Authority designated in the Mutual Legal Assistance Treaty in Criminal Matters between the Government of the Federative Republic of Brazil and the Government of the United States of America, besides the United Nations Convention against Corruption and the United Nations against Transnational Organized Crime, we hereby transmit the attached request for mutual legal assistance in criminal matters arising from the Police Investigation #303/2007-DPF/FIG/PR, under way at the Federal Police Department in Foz do Iguaçu, State of Paraná.

2. This request aims at obtaining the bank records of Lloyd Bank accounts in Miami/Florida, under the name of **Arturo José Josky Brudner,** between 1999 and 2009. Mr. Brudner is being investigated for tax evasion.

3. Furthermore, the competent authorities asked **confidentiality** and **urgency** in this request execution.

4. Please do not hesitate to contact us should you need any clarification.

Sincerely,

Rodrigo Gonzaga Sagastume
Deputy Coordinator

ra/rags

SCN Qd. 06, Conj. A, Bl. A, 2°Andar – Edifício Venâncio 3000. Brasília-DF. CEP – 70716-900
Telefone: ▮▮▮▮     Fax: ▮▮▮▮     E-mail: ▮▮▮▮

## REQUEST FOR LEGAL ASSISTANCE IN CRIMINAL MATTERS

**CONFIDENTIAL Procedure?** (Note: in case confidentiality requirements for this international legal cooperation request are not informed, the parties may have access to its content upon request, in accordance with Federal Law nº 12.527/2011. Furthermore, in case this request becomes classified by decision of the Requesting State in the course of the criminal procedure, the DRCI shall be immediately informed).

[X] **YES**

[ ] **NO**

**Do Requested and Requesting States border each other?**

[ ] **YES**

[X] **NO**

1. **Requested State:** United States of America Department of Justice.

2. **Requesting State:** Department of Assets Recovery and International Legal Cooperation - **DRCI**, National Secretariat of Justice - Ministry of Justice of Brazil.

3. **Subject:** Request for judicial assistance in criminal matters according to Decree nº 3.810/2001, which enacts The Treaty between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters, signed on October 14, 1997.

4. **Reference:** Police Investigation nº 303/2007-DPF/FIG/PR.

5. **Summary:**

**The balance of the account on the last day of each year being investigated, that is from 1999 through 2009, is necessary in order to determine the materiality of the crime described by the article 22, sole paragraph, of Law 7492/86.**

6. **Facts:**

This request refers to the current police investigation nº 303/2007-DPF/FIG/PR, opened on April 4th, 2007 to investigate unreported remittance of currency committed by the Paraguayan citizen ARTURO JOSÉ JOSKY BRUDNER (who holds fiscal residence in Brazil and Paraguay). In the course of Investigation nº 171/03-DPF/PPA/MS, ARTURO BRUDNER declared in his statement, on

January 26th, 2005, being the holder of a bank account in Lloyds Bank in Miami/USA, not reported to the Central Bank of Brazil.

Up to this moment, ARTURO JOSÉ JOSKY BRUDNER, has not been located. The police investigation was launched in the city of Foz do Iguaçú/PR, with the purpose of establishing the existence, origin and lawfulness of the funds in his bank account in the Lloyds Bank in Miami, considering that ARTURO declared to be living in Foz do Iguaçú/PR, as his last fiscal residence in Brazil, where he also declared to have a banking account in Banco do Brasil and have formed a company.

A request for mutual legal assistance was issued so that the United States of America could provide financial reports of all ARTURO JOSÉ SOSKY BRUDNER banking accounts since 1996, especially the one held in the Lloyds Bank in Miami.

In regards to this request, the Department of Assets Recovery and International Legal Cooperation - DRCI, through the Official Letter n° 2753/2009/DRCI-SNJ-MJ, reported the registries provided by the American financial institution.

The forensic experts (through the financial analyses on the report n° 0991/2011-NUTEC/DPF/FIG/PR), have verified that ARTURO JOSÉ SOSKY BRUDNER is the holder, along with ██████████ (late co-holders) of banking account n° ████████ and investment account n° ████████ both in Lloyds Bank. The accounts were open in 1997. According to the experts, the "banking account statements comprehend the period from January 1st, 1999 through April 18th, 2008, the statements referring to the period of January 1st, 1999 through December 31st, 2005 do not show any funds." However, the documentation provided to the experts did not show the balance on the last day of each year.

In July 4th, 2011, a waiver of banking secrecy for ARTURO JOSÉ SOSKY BRUDNER, ██████████████████████████████████████████ was filed in Lloyds Bank in Miami, with the purpose of obtaining complimentary documentation, especially statements showing the balance of the mentioned accounts on the last day of each year, from 1999 through 2009.

The 3rd Federal Criminal Court in Curitiba/PR accepted the waiver of banking secrecy, extending the breach of fiscal secrecy previously admitted until 2009.

The Brazilian Internal Revenue branch in Brasilia has informed that there are no internal fiscal procedures related to ARTURO JOSÉ SOSKY BRUDNER.

The Brazilian Central Bank (BACEN) has informed that ARTURO JOSÉ SOSKY BRUDNER did not submit the Report on Brazilian Funds Located Overseas during the period of 2001 and 2005 (it should be highlighted that "the declaration of goods and values owned abroad has been required by the Resolution CMN n° 2911 of November 29th, 2001 and Letter n° 3071 of December 7th, 2001").

In summary, the current investigation aims at establishing whether ARTURO JOSÉ SOSKY BRUDNER held deposits in Lloyds Bank in the USA not informing the

Central Bank and Internal Revenue such financial assets (falling into article 22, sole paragraph, of Law 7492/86).

The offenders described by the article 22, sole paragraph, of Law 7492/86 are individuals and/or companies based in Brazil. ARTURO is registered at the Internal Revenue System (Cadastro de Pessoa Física – CPF) under number 155.850.421-49. Notwithstanding ARTURO being a Paraguayan citizen and, as he declared, resident in Assunção – Paraguay, he submitted the 2003 Internal Revenue Form informing his address as being Avenida República Argentina, nº 3555, Campos do Iguaçú, Foz do Iguaçú/PR, Brazil.

So far the known facts are as follows:

1. The foreign account exists;
2. The investigated individual is the owner along with his sister and late mother;
3. The account was created in 1997;
4. The financial funds held in the mentioned account were not declared to the Central Bank nor the Internal Revenue.

**7. Law transcription: Article 22, sole paragraph of Law 7.492/86;**

Article 22 - Perform an unauthorized exchange operation with the purpose of promoting unreported remittance of currency from Brazil.

Sole paragraph. The same penalty shall be applied to whomever under any pretense, and without any legal authorization, promotes the remittance of money or foreign currency abroad, or maintains in a foreign country deposits unreported to the competent federal authority.

Penalty – imprisonment for 2 (two) to 6 (six) years and a fine.

**8. Requested assistance:**

| Proceedings | Requirements |
|---|---|
| **Breach of bank secrecy and obtaining of bank documents:** | **Bank: Lloyds Bank in Miami/USA**<br><br>**Address:** ████<br>**Miami, Florida, 33131**<br><br>**Banking Account number:** ████<br><br>**Investment account nº:** ████<br><br>**Account holder: ARTURO JOSÉ SOSKY BRUDNER (DoB** ████ **e co-owners** ████ **and** ████ |

|  | Information requested: Balance of banking and investment accounts on the last day (December 31st) of each year from 1999 until 2009 – in digital media.<br><br>In order to prove the existence of unreported remittance of currency is necessary to prove that ARTURO JOSÉ SOSKY BRUDNER held on the last day of each year between 1999 and 2009 funds in foreign bank accounts not declared to the Internal Revenue and Central Bank of Brazil.<br><br>Sentence from the 3rd Federal Court in Curitiba originated from the investigation IPL 0000255-382012.404.7000/PR. The Court is specialized in Financial Crimes and Money Laundering, authorizing, therefore, the breach of bank and fiscal secrecy of the investigated individual. |
| --- | --- |

**9. Purpose of the request:** Identify funds held in banking and investment accounts in Lloyds Bank of Miami/EUA, in the period of 1999 through 2009, whose owner is ARTURO JOSÉ JOSKY BRUDNER, in order to establish the materiality of unreported remittance of currency, since the owner did not declare such funds to the Central Bank of Brazil and to the Internal Revenue, as obliged by Law.

**10. Procedures to be observed:**

a) Actions shall be taken without the knowledge of the investigated individuals.

b) It is requested that the information shall be provided in magnetic media, to make the analyses easier.

c) It is also requested the consent of the Central Authority in United States for the information provided to be used in further investigations, in case new evidences arise from the information.


Foz do Iguaçú – October 27th, 2015


RAFAELLA VIEIRA LINS PARÇA
Federal Police Commissioner

United States Code    Effective: October 19, 2009
Title 18. Crimes and Criminal Procedure
Part II. Criminal Procedure
Chapter 223. Witnesses and Evidence
§ 3512. Foreign requests for assistance in criminal investigations and prosecutions

(a) Execution of request for assistance.--

(1) In general.--Upon application, duly authorized by an appropriate official of the Department of Justice, of an Attorney for the Government, a Federal judge may issue such orders as may be necessary to execute a request from a foreign authority for assistance in the investigation or prosecution of criminal offenses, or in proceedings related to the prosecution of criminal offenses, including proceedings regarding forfeiture, sentencing, and restitution.

(2) Scope of orders.--Any order issued by a Federal judge pursuant to paragraph (1) may include the issuance of--

(A) a search warrant, as provided under Rule 41 of the Federal Rules of Criminal Procedure;

(B) a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703 of this title;

(C) an order for a pen register or trap and trace device as provided under section 3123 of this title; or

(D) an order requiring the appearance of a person for the purpose of providing testimony or a statement, or requiring the production of documents or other things, or both.

(b) Appointment of persons to take testimony or statements.--

(1) In general.--In response to an application for execution of a request from a foreign authority as described under subsection (a), a Federal judge may also issue an order appointing a person to direct the taking of testimony or statements or of the production of documents or other things, or both.

(2) Authority of appointed person.--Any person appointed under an order issued pursuant to paragraph (1) may--

(A) issue orders requiring the appearance of a person, or the production of documents or other things, or both;

(B) administer any necessary oath; and

(C) take testimony or statements and receive documents or other things.

(c) Filing of requests.--Except as provided under subsection (d), an application for execution of a

request from a foreign authority under this section may be filed--

(1) in the district in which a person who may be required to appear resides or is located or in which the documents or things to be produced are located;

(2) in cases in which the request seeks the appearance of persons or production of documents or things that may be located in multiple districts, in any one of the districts in which such a person, documents, or things may be located; or

(3) in any case, the district in which a related Federal criminal investigation or prosecution is being conducted, or in the District of Columbia.

(d) Search warrant limitation.--An application for execution of a request for a search warrant from a foreign authority under this section, other than an application for a warrant issued as provided under section 2703 of this title, shall be filed in the district in which the place or person to be searched is located.

(e) Search warrant standard.--A Federal judge may issue a search warrant under this section only if the foreign offense for which the evidence is sought involves conduct that, if committed in the United States, would be considered an offense punishable by imprisonment for more than one year under Federal or State law.

(f) Service of order or warrant.--Except as provided under subsection (d), an order or warrant issued pursuant to this section may be served or executed in any place in the United States.

(g) Rule of construction.--Nothing in this section shall be construed to preclude any foreign authority or an interested person from obtaining assistance in a criminal investigation or prosecution pursuant to section 1782 of title 28, United States Code.

(h) Definitions.--As used in this section, the following definitions shall apply:

(1) Federal judge.--The terms "Federal judge" and "Attorney for the Government" have the meaning given such terms for the purposes of the Federal Rules of Criminal Procedure.

(2) Foreign authority.--The term "foreign authority" means a foreign judicial authority, a foreign authority responsible for the investigation or prosecution of criminal offenses or for proceedings related to the prosecution of criminal offenses, or an authority designated as a competent authority or central authority for the purpose of making requests for assistance pursuant to an agreement or treaty with the United States regarding assistance in criminal matters.

(Added Pub.L. 111-79, § 2(4), Oct. 19, 2009, 123 Stat. 2087.)
18 U.S.C.A. § 3512, 18 USCA § 3512
Current through P.L. 111-86 (excluding P.L. 111-84) approved 10-29-09

1

| 105TH CONGRESS<br>*2d Session* | SENATE | TREATY DOC.<br>105–42 |
|---|---|---|

## TREATY WITH BRAZIL ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

---

# MESSAGE

FROM

# THE PRESIDENT OF THE UNITED STATES

TRANSMITTING

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF THE FEDERATIVE REPUBLIC OF BRAZIL ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, SIGNED AT BRASILIA ON OCTOBER 14, 1997



APRIL 28, 1998.—Treaty was read the first time and, together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate.

---

U.S. GOVERNMENT PRINTING OFFICE

59–118

WASHINGTON : 1998

# LETTER OF TRANSMITTAL

————

THE WHITE HOUSE, *April 28, 1998.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty between the Government of the United States of America and the Government of the Federal Republic of Brazil on Mutual Legal Assistance in Criminal Matters, signed at Brasilia on October 14, 1997. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties that the United States is negotiating in order to counter criminal activities more effectively. The Treaty should be an effective tool to assist in the prosecution of a wide variety of modern criminals, including those involved in terrorism, other violent crimes, drug trafficking, money laundering, and other "white-collar" crime. The Treaty is self-executing, and will not require new legislation.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the Treaty includes:

(1) Locating or identifying persons or items; (2) serving documents; (3) taking testimony or statements of persons; (4) transferring persons in custody for testimony or other purposes; (5) providing documents, records, and items; (6) executing requests for searches and seizures; (7) assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection of fines; and (8) any other form of assistance not prohibited by the laws of the Requested State.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

WILLIAM J. CLINTON.

(III)

## LETTER OF SUBMITTAL

———————

DEPARTMENT OF STATE,
*Washington.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of the Federative Republic of Brazil on Mutual Legal Assistance in Criminal Matters ("the Treaty"), signed at Brasilia on October 14, 1997. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with a number of countries. This Treaty contains many provisions similar to those in the other treaties.

The Treaty will enhance our ability to investigate and prosecute a variety of offenses, including drug trafficking, terrorism, other violent crimes, and money laundering and other white-collar crime. The Treaty is designed to be self-executing and will not require new legislation.

Article 1 contains a non-exhaustive list of the major types of assistance to be provided under the Treaty, including taking the testimony or statements of persons; providing documents, records, and items; locating or identifying persons or items; serving documents; transferring persons in custody for testimony or other purposes; executing requests for searches and seizures; assisting in proceedings related to immobilization and forfeiture of assets, restitution, and collection of fines; and providing any other form of assistance not prohibited by the laws of the Requested States.

The scope of the Treaty includes not only the investigation, prosecution, and prevention of criminal offenses, but also forfeiture, restitution, and collection of fines, and other proceedings related to criminal matters, which may be civil or administrative in nature. Moreover, assistance under the Treaty is to be provided without regard to dual criminality (*i.e.,* whether the conduct involved would constitute an offense under the laws of both States).

Article 1(4) states that the Parties recognize the particular importance of combating serious criminal activities, including money laundering and the illicit trafficking in firearms, ammunition, and explosives, and that the Parties shall provide each other with assistance with respect to such matters. However, the paragraph was not intended by the negotiators to require the Parties to give priority or special treatment to assistance with respect to the specified offenses; accordingly, the paragraph expressly provides that the

VI

commitment to provide assistance regarding such offenses imposes no limitation on the scope of assistance established under the Article.

Article 1 also states explicitly that the Treaty is intended solely for mutual legal assistance between the Parties. The Treaty provisions shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impeded the execution of a request.

Article 2 provides for the establishment of Central Authorities and defines the Central Authorities for purposes of the Treaty. For the United States, the Central Authority shall be the Attorney General or a person designated by the Attorney General. For Brazil, the Central Authority shall be the Ministry of Justice. The Article provides that the Central Authorities shall make and receive requests pursuant to the Treaty, and that the Central Authorities shall communicate directly with one another for purposes of the Treaty.

Article 3 sets forth the circumstances under which the Central Authority of the Requested State may deny assistance under the Treaty. A request may be denied if it relates to a military offense that would not be an offense under ordinary criminal law; if its execution would prejudice the security or similar essential interests of the Requested State; or if the request is not made in conformity with the Treaty.

Before denying assistance under Article 3, the Central Authority of the Requested State is required to consult with its counterpart in the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary. If the Requesting State accepts assistance subject to conditions, it is required to comply with them. If the Central Authority of the Requested State denies assistance, it must inform the Central Authority of the Requesting State of the reasons for the denial.

Article 4 prescribes the form and contents of requests under the Treaty, specifying in detail the information required in each request. The Article provides that requests for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations. In such cases, unless the Central Authority of the Requested State agrees otherwise, the request must be confirmed in writing within thirty days thereafter. Unless otherwise agreed, all requests and supporting documents shall be in the language of the Requested State.

Article 5 requires that the Central Authority of the Requested State promptly execute requests or, when appropriate, transmit them to the authority having jurisdiction to do so. The Article provides that the competent authorities of the Requested State shall do everything in their power to execute a request. The Courts of the Requested State shall issue subpoenas, search warrants, or other orders necessary to execute the request.

The Central Authority of the Requested State must make all necessary arrangements for and meet the costs of representation of the Requesting State in any proceedings arising out of a request for assistance pursuant to the Treaty. Under Article 5(3), requests are to be executed in accordance with the laws of the Requested State except to the extent that the Treaty provides otherwise. However, the

VII

method of execution specified in the request is to be followed except insofar as it is prohibited by the laws of the Requested State.

If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution or, after consultations with the Central Authority of the Requesting State, impose conditions on such execution. If the Requesting State accepts assistance subjects to such conditions, it must comply with them.

Article 5(5) further requires the Requested State, if so requested by the Requesting State, to use its best efforts to keep confidential a request and its contents. If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State must so inform the Central Authority of the Requesting State. This provides the Requesting States with the opportunity to decide whether to pursue the request or to withdraw it in order to maintain confidentiality.

Finally, Article 5 requires the Central Authority of the Requested State to respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request; to promptly inform such Central Authority of the outcome of the execution of the request; and, if the execution of the request is denied, delayed, or postponed, to inform such Central Authority of the reasons therefor.

Article 6 apportions between the two States the costs incurred in executing a request. It provides that the Requested State shall pay all such costs, except for the following items, which shall be paid by the Requesting State: fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to the travel of persons pursuant to Articles 10 and 11.

Article 7 provides that the Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under the Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State. The Central Authority of the Requested State may request that information or evidence furnished under the Treaty be kept confidential or be used only subject to terms and conditions it may specify. If the Requesting State accepts the information or evidence subject to such conditions, it shall comply with the conditions. These limitations on use to not preclude a constitutionally required disclosure or use of information in a criminal prosecution. Advance notice by the Requesting State of such disclosure or use is required. Once information or evidence has been made public in the Requesting State in a manner consistent with the other provisions of the Article, no further limitations on use apply, and the information or evidence may thereafter be used for any purpose.

Article 8 provides that a person in the Requested State from whom evidence is required pursuant to the Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or items. The Article requires the Central Authority of the Requested State, upon request, to inform the Requesting State in

VIII

advance about the date and place of the taking of testimony or evidence.

Article 8(3) also requires the Requested State to permit the presence of persons designated in the request during the execution of the request, and to allow such persons to present questions to be posed to the person giving the testimony or evidence. Article 8(4) provides that, in the event that a person whose testimony or evidence is being taken asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State so that the claim may be resolved by the authorities of that State.

Finally, Article 8(5) provides a mechanism for authentication of documentary evidence produced pursuant to this Article. A form for use regarding business records is included as an appendix to the Treaty (Form A). Records authenticated by means of such form shall be admissible in evidence in the Requesting State.

Article 9 requires that the Requested State provide the Requesting State with copies of publicly available records in the possession of authorities in the Requested State. The Requested State may further provide copies of any records, including documents or information in any form, that are in the possession of authorities in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities. However, the Requested State has the discretion to deny such requests entirely or in part. Such official records may be authenticated by the official in charge of maintaining them through the use of Form B appended to the Treaty. Documents authenticated through the use of such form shall be admissible in evidence in the Requesting State.

Article 10 provides a mechanism for the Requesting State to invite the voluntary appearance in its territory of a person located in the Requested State. The Requesting State is required to indicate the extent to which the expenses of the person will be paid. The Central Authority of the Requested State is required to invite the person to appear and promptly to inform the Requesting State of the person's response.

Article 10 further provides that the Central Authority of the Requesting State has discretion to determine that a person appearing in that State pursuant to this Article shall not be subject to service of process, detained, or subjected to any restriction of personal liberty by reason of acts or convictions that preceded the person's departure from the Requested State. The Central Authority of the Requesting State is required to notify the Requested State's Central Authority whether such safe conduct shall be extended. Any safe conduct provided for by this Article shall cease seven days after notification by the Central Authority of the Requesting State to its counterpart in the Requested State that the person's presence is no longer required. The safe conduct shall also cease if the person leaves the Requesting State but voluntarily returns to it. An extension of up to fifteen days may be granted by the Requesting State's Central Authority in its discretion.

Article 11 provides for the temporary transfer of a person in custody in the Requested State to the Requesting State for purposes

of assistance under the Treaty, provided that the person in question and the Central Authorities of both States agree. For example, a witness incarcerated in the Requested State may be transferred to the Requesting State to have his deposition taken in the presence of the defendant. The Article also provides for the transfer of a person in the custody of the Requesting State to the Requested State for purposes of assistance under the Treaty, subject to the consent of the person and the Central Authorities of both States. For example, a defendant in the Requesting State may be transferred for purposes of attending a witness deposition in the Requested State.

Article 11(3) further establishes the express authority and the obligation of the receiving State to maintain the person transferred in custody unless otherwise authorized by the sending State. It further obligates the receiving State to return the person to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both States, and the sending State need not initiate extradition proceedings for return of the person transferred. The person transferred shall receive credit toward service of the sentence imposed in the sending State for time served in the custody of the receiving State.

Article 12 requires the Requested State to use its best efforts to ascertain the location or identity of persons or items specified in a request.

Article 13 obligates the Requested State to use its best efforts to effect service of any documents relating, in whole or in part, to any request for assistance under the Treaty. A request for the service of a document requiring a person to appear before an authority in the Requesting State must be transmitted within a reasonable time prior to the scheduled appearance. The Requested State is required to return proof of service in the manner specified in the request.

Article 14 obligates the Requested State to execute requests for search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State. The Article provides that, upon request, every official of the Requested State who has had custody of a seized item shall certify, through the use of Form C appended to the Treaty, the description of the item, the continuity of its custody, and the integrity of its condition. No further certification is required, and the certificate shall be admissible evidence in the Requesting State. Article 14 further provides that the Central Authority of the Requested State may impose upon the Requesting State terms and conditions deemed necessary to protect third party interests in items to be transferred.

Article 15 requires the Central Authority of the Requested State, upon request of its counterpart in the Requesting State, to return as soon as possible any documents, records, or items furnished to it in execution of a request under the Treaty.

Article 16 provides that, if the Central Authority of one Party becomes aware of proceeds or instrumentalities of offenses that are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure under the laws of that Party, it may so inform the Central Authority of that Party. If that Party has jurisdiction, it may present this information to its authorities for a

X

determination whether any action is appropriate under its laws, and such authorities shall, through their Central Authority, notify the other Party of any action taken.

Article 16 also obligates the Parties to assist each other, to the extent permitted by their respective laws, in proceedings relating to forfeiture of proceeds and instrumentalities of offenses, restitution to victims of crime, and the collection of fines imposed as sentences in criminal proceedings. Such assistance may include action to temporarily immobilize the proceeds or instrumentalities of crime pending further proceedings. A Party having custody over proceeds or instrumentalities of offenses is required to dispose of them in accordance with its laws. Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the extent permitted by the transferring Party's laws and upon such terms as it deems appropriate.

Article 17 states that assistance and procedures set forth in the Treaty shall not prevent either Party from granting assistance to the other Party under other applicable international agreements, or through the provisions of its national laws. The Parties may also provide assistance to each other through the provisions of any bilateral arrangement, agreement, or practice that may be applicable.

Article 18 provides that the Central Authorities of the parties shall consult, at times mutually agreed upon, to promote the most effective use of the Treaty, and may agree on such practical measures as may be necessary to facilitate implementation of the Treaty.

Article 19 states that the Treaty shall apply to requests presented after the date of its entry into force, even if the acts or omissions constituting the offense occurred before that date.

Article 20 provides that the Treaty is subject to ratification and shall enter into force upon the exchange of the instruments of ratification. The Article also provides that the Parties may amend the Treaty by mutual agreement, and any such amendment would enter into force upon a written exchange of notifications between the Parties, through the diplomatic channel, that all domestic requirements for its entry into force have been completed. Article 20 further provides that either Party may terminate the Treaty by written notice to the other Party. Such termination would take effect six months following the date of notification.

A Technical Analysis explaining in detail the provisions of the Treaty is being prepared by the United States negotiating delegation, consisting of representatives from the Departments of Justice and State, and will be transmitted separately to the Senate Committee on Foreign Relations.

The Department of Justice joins the Department of State in recommending approval of this Treaty by the Senate as soon as possible.

Respectfully submitted.

MADELEINE ALBRIGHT.

TREATY BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE FEDERATIVE REPUBLIC OF BRAZIL
ON
MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

2

## TABLE OF CONTENTS

Article 1            Scope of Assistance
Article 2            Central Authorities
Article 3            Limitations on Assistance
Article 4            Form and Contents of Requests
Article 5            Execution of Requests
Article 6            Costs
Article 7            Limitations on Use
Article 8            Testimony or Evidence
           in the Requested State
Article 9            Official Records
Article 10           Testimony in the Requesting State
Article 11           Transfer of Persons in Custody
Article 12           Location or Identification
           of Persons or Items
Article 13           Service of Documents
Article 14           Search and Seizure
Article 15           Return of Items
Article 16           Assistance in Forfeiture Proceedings
Article 17           Compatibility with Other Treaties
Article 18           Consultation
Article 19           Application
Article 20           Ratification, Entry Into Force,
           and Termination


Form A   Certificate of Authenticity of Business Records
Form B   Attestation of Authenticity of Foreign Public Documents
Form C   Attestation With Respect to Seized Articles

3

The Government of the United States of America and the Government of the Federative Republic of Brazil,

Desiring to improve the effectiveness of the law enforcement authorities of both countries in the investigation, prosecution, and prevention of crime through cooperation and mutual legal assistance in criminal matters,

Have agreed as follows:

4

## Article 1
### Scope of Assistance

1.   The Parties shall provide mutual assistance, in accordance with the provisions of this Treaty, in connection with the investigation, prosecution, and prevention of offenses, and in proceedings related to criminal matters.

2.   Assistance shall include:
   (a)   taking the testimony or statements of persons;
   (b)   providing documents, records, and items;
   (c)   locating or identifying persons or items;
   (d)   serving documents;
   (e)   transferring persons in custody for testimony or other purposes;
   (f)   executing requests for searches and seizures;
   (g)   assisting in proceedings related to immobilization and forfeiture of assets; restitution; collection of fines; and
   (h)   any other form of assistance not prohibited by the laws of the Requested State.

3.   Assistance shall be provided without regard to whether the conduct that is the subject of the investigation, prosecution, or proceeding would be punishable under the legislation in both States.

4.   The Parties recognize the particular importance of combating serious criminal activities, including money laundering and the illicit trafficking in firearms, ammunition and explosives. Without limitation to the scope of assistance established in this Article, the Parties shall provide each other assistance on such matters in accordance with this Treaty.

5

5.   This Treaty is intended solely for mutual legal assistance between the Parties.  The provisions of this Treaty shall not give rise to a right on the part of any private person to obtain, suppress, or exclude any evidence, or to impede the execution of a request.

### Article 2
### Central Authorities

1.   Each Party shall designate a Central Authority to make and receive requests pursuant to this Treaty.

2.   For the United States of America, the Central Authority shall be the Attorney General or a person designated by the Attorney General.  For the Federative Republic of Brazil, the Central Authority shall be the Ministry of Justice.

3.   The Central Authorities shall communicate directly with one another for the purposes of this Treaty.

### Article 3
### Limitations on Assistance

1.   The Central Authority of the Requested State may deny assistance if:

    (a)   the request relates to an offense under military law which would not be an offense under ordinary criminal law;

    (b)   the execution of the request would prejudice the security or similar essential interests of the Requested State; or

    (c)   the request is not made in conformity with the Treaty.

2.   Before denying assistance pursuant to this Article, the Central Authority of the Requested State shall consult with the

6

Central Authority of the Requesting State to consider whether assistance can be given subject to such conditions as it deems necessary.  If the Requesting State accepts assistance subject to these conditions, it shall comply with the conditions.

3.   If the Central Authority of the Requested State denies assistance, it shall inform the Central Authority of the Requesting State of the reasons for the denial.

### Article 4
### Form and Contents of Requests

1.   A request for assistance shall be in writing except that the Central Authority of the Requested State may accept a request in another form in urgent situations.  In any such case, if the request is not in writing, it shall be confirmed in writing within thirty days thereafter unless the Central Authority of the Requested State agrees otherwise.  The request shall be in the language of the Requested State unless otherwise agreed.

2.   The request shall include the following:

(a)   the name of the authority conducting the investigation, prosecution, or proceeding to which the request relates;

(b)   a description of the subject matter and nature of the investigation, prosecution, or proceeding, including, to the extent known, the specific criminal offenses that relate to the matter;

(c)   a description of the evidence, information, or other assistance sought; and

(d)   a statement of the purpose for which the evidence, information, or other assistance is sought.

7

3.   To the extent necessary and possible, a request shall
also include:

(a)   information on the identity and location of any
person from whom evidence is sought;

(b)   information on the identity and location of a
person to be served, that person's relationship to
the proceedings, and the manner in which service is
to be made;

(c)   information on the identity and whereabouts of a
person to be located;

(d)   a precise description of the place or person to be
searched and of the items to be seized;

(e)   a description of the manner in which any testimony
or statement is to be taken and recorded;

(f)   a list of questions to be asked of a witness;

(g)   a description of any particular procedure to be
followed in executing the request;

(h)   information as to the allowances and expenses to
which a person asked to appear in the Requesting
State will be entitled; and

(i)   any other information that may be brought to the
attention of the Requested State to facilitate the
execution of the request.

## Article 5
### Execution of Requests

1.   The Central Authority of the Requested State shall
promptly execute the request or, when appropriate, shall transmit
it to the officials having authority to do so.  The competent
officials of the Requested State shall do everything in their power
to execute the request.  The Courts of the Requested State shall
issue subpoenas, search warrants, or other orders necessary to
execute the request.

8

2.   The Central Authority of the Requested State shall make all necessary arrangements for and meet the costs of the representation in the Requested State of the Requesting State in any proceedings arising out of a request for assistance pursuant to this Treaty.

3.   Requests shall be executed in accordance with the laws of the Requested State except to the extent that this Treaty provides otherwise.  However, the method of execution specified in the request shall be followed except insofar as it is prohibited by the laws of the Requested State.

4.   If the Central Authority of the Requested State determines that execution of a request would interfere with an ongoing criminal investigation, prosecution, or proceeding in that State, it may postpone execution, or make execution subject to conditions determined to be necessary after consultations with the Central Authority of the Requesting State.  If the Requesting State accepts the assistance subject to the conditions, it shall comply with the conditions.

5.   The Requested State shall use its best efforts to keep confidential a request and its contents if such confidentiality is requested by the Central Authority of the Requesting State.  If the request cannot be executed without breaching such confidentiality, the Central Authority of the Requested State shall so inform the Central Authority of the Requesting State, which shall then determine whether the request should nevertheless be executed.

6.   The Central Authority of the Requested State shall respond to reasonable inquiries by the Central Authority of the Requesting State concerning progress toward execution of the request.

9

7.   The Central Authority of the Requested State shall promptly inform the Central Authority of the Requesting State of the outcome of the execution of the request.  If the execution of the request is denied, delayed, or postponed, the Central Authority of the Requested State shall inform the Central Authority of the Requesting State of the reasons for the denial, delay, or postponement.

## Article 6
### Costs

The Requested State shall pay all costs relating to the execution of the request, except for the fees of expert witnesses, the costs of translation, interpretation, and transcription, and the allowances and expenses related to travel of persons pursuant to Articles 10 and 11, which fees, costs,  allowances, and expenses shall be paid by the Requesting State.

## Aricle 7
### Limitations on Use

1.   The Central Authority of the Requested State may request that the Requesting State not use any information or evidence obtained under this Treaty in any investigation, prosecution, or proceeding other than that described in the request without the prior consent of the Central Authority of the Requested State.  In such cases, the Requesting State shall comply with the conditions.

2.   The Central Authority of the Requested State may request that information or evidence furnished under this Treaty be kept confidential or be used only subject to terms and conditions it may specify.  If the Requesting State accepts the information or evidence subject to such conditions, the Requesting State shall comply with the conditions.

10

3.    Nothing in this Article shall preclude the use or disclosure of information to the extent that there is an obligation to do so under the Constitution of the Requesting State in a criminal prosecution.  The Requesting State shall notify the Requested State in advance of any such proposed disclosure.

4.    Information or evidence that has been made public in the Requesting State in a manner consistent with paragraph 1 or 2 may thereafter be used for any purpose.

## Article 8
### Testimony or Evidence in the Requested State

1.    A person in the Requested State from whom testimony or evidence is requested pursuant to this Treaty shall be compelled, if necessary, to appear and testify or produce documents, records, or items.

2.    Upon request, the Central Authority of the Requested State shall furnish information in advance about the date and place of the taking of the testimony or evidence pursuant to this Article.

3.    The Requested State shall permit the presence of such persons as specified in the request during the execution of the request, and shall allow such persons to present questions to be asked of the person giving the testimony or evidence.

4.    If the person referred to in paragraph 1 asserts a claim of immunity, incapacity, or privilege under the laws of the Requesting State, the testimony or evidence shall nonetheless be taken and the claim made known to the Central Authority of the Requesting State so that the claim may be resolved by the authorities of that State.

11

5.   Evidence produced in the Requested State pursuant to this Article or which is the subject of testimony taken under this Article may be authenticated by an attestation, including, in the case of business records, authentication in the manner indicated in Form A appended to this Treaty.  Documents authenticated by Form A shall be admissible evidence in the Requesting State.

### Article 9
### Official Records

1.   The Requested State shall provide the Requesting State with copies of publicly available records, including documents or information in any form, in the possession of authorities in the Requested State.

2.   The Requested State may provide copies of any records, including documents or information in any form, that are in the possession of authorities in that State, but that are not publicly available, to the same extent and under the same conditions as such copies would be available to its own law enforcement or judicial authorities.  The Requested State may in its discretion deny a request pursuant to this paragraph entirely or in part.

3.   Official records produced pursuant to this Article may be authenticated by the official in charge of maintaining them through the use of Form B appended to this Treaty.  No further authentication shall be necessary.  Documents authenticated under this paragraph shall be admissible evidence in the Requesting State.

### Article 10
### Testimony in the Requesting State

1.   When the Requesting State requests the appearance of a person in that State, the Requested State shall invite the person

12

to appear before the appropriate authority in the Requesting State.
The Requesting State shall indicate the extent to which the
expenses will be paid.  The Central Authority of the Requested
State shall promptly inform the Central Authority of the Requesting
State of the response of the person.

2.   The Central Authority of the Requesting State may, in
its discretion, determine that a person appearing in the Requesting
State pursuant to this Article shall not be subject to service of
process, or be detained or subjected to any restriction of personal
liberty, by reason of any acts or convictions that preceded his
departure from the Requested State. The Central Authority of the
Requesting State shall promptly inform the Central Authority of the
Requested State whether such safe conduct shall be extended.

3.   The safe conduct provided for by this Article shall
cease seven days after the Central Authority of the Requesting
State has notified the Central Authority of the Requested State
that the person's presence is no longer required, or when the
person, having left the Requesting State, voluntarily returns.  The
Central Authority of the Requesting State may, in its discretion,
extend this period for up to fifteen days.

Article 11
Transfer of Persons in Custody

1.   A person in the custody of the Requested State whose
presence in the Requesting State is sought for purposes of
assistance under this Treaty shall be transferred from the
Requested State to the Requesting State for that purpose if the
person consents and if the Central Authorities of both States
agree.

2.   A person in the custody of the Requesting State whose
presence in the Requested State is sought for purposes of
assistance under this Treaty may be transferred from the Requesting

13

State to the Requested State if the person consents and if the Central Authorities of both States agree.

3.   For purposes of this Article:

    (a)   the receiving State shall have the authority and the obligation to keep the person transferred in custody unless otherwise authorized by the sending State;

    (b)   the receiving State shall return the person transferred to the custody of the sending State as soon as circumstances permit or as otherwise agreed by both Central Authorities;

    (c)   the receiving State shall not require the sending State to initiate extradition proceedings for the return of the person transferred; and

    (d)   the person transferred shall receive credit for service of the sentence imposed in the sending State for time served in the custody of the receiving State.

## Article 12
### Location or Identification of Persons or Items

The Requested State shall use its best efforts to ascertain the location or identity of persons or items specified in the request.

## Article 13
### Service of Documents

1.   The Requested State shall use its best efforts to effect service of any document relating, in whole or in part, to any

14

request for assistance made by the Requesting State under the provisions of this Treaty.

2.   The Requesting State shall transmit any request for the service of a document requiring the appearance of a person before an authority in the Requesting State within a reasonable time prior to the scheduled appearance.

3.   The Requested State shall return a proof of service in the manner specified in the request.

### Article 14
### Search and Seizure

1.   The Requested State shall execute a request for the search, seizure, and delivery of any item to the Requesting State if the request includes the information justifying such action under the laws of the Requested State.

2.   Upon request, every official who has custody of a seized item shall certify, through the use of Form C appended to this Treaty, the continuity of custody, the description of the item, and the integrity of its condition.  No further certification shall be required.  Form C shall be admissible evidence in the Requesting State.

3.   The Central Authority of the Requested State may require that the Requesting State agree to the terms and conditions deemed to be necessary to protect third party interests in the item to be transferred.

15

### Article 15
### Return of Items

The Central Authority of the Requested State may require that the Central Authority of the Requesting State return, as soon as possible, any documents, records, or items furnished to it in execution of a request under this Treaty.

### Article 16
### Assistance in Forfeiture Proceedings

1.   If the Central Authority of one Party becomes aware of proceeds or instrumentalities of offenses that are located in the territory of the other Party and may be forfeitable or otherwise subject to seizure under the laws of that Party, it may so inform the Central Authority of the other Party.  If that other Party has jurisdiction in this regard, it may present this information to its authorities for a determination whether any action is appropriate. These authorities shall issue their decision in accordance with the laws of their country, and shall, through their Central Authority, report to the other Party on the action taken.

2.   The Parties shall assist each other to the extent permitted by their respective laws in proceedings relating to the forfeiture of the proceeds and instrumentalities of offenses, restitution to the victims of crime, and the collection of fines imposed as sentences in criminal prosecutions.  Such assistance may include action to temporarily immobilize the proceeds or instrumentalities pending further proceedings.

3.   The Party that has custody over proceeds or instrumentalities of offenses shall dispose of them in accordance with its laws.  Either Party may transfer all or part of such assets, or the proceeds of their sale, to the other Party, to the

16

extent permitted by the transferring Party's laws and upon such
terms as it deems appropriate.

Article 17
Compatibility with Other Treaties

Assistance and procedures set forth in this Treaty shall not
prevent either Party from granting assistance to the other Party
through the provisions of other applicable international
agreements, or through the provisions of its national laws.  The
Parties may also provide assistance to each other pursuant to any
bilateral arrangement, agreement, or practice that may be
applicable.

Article 18
Consultation

The Central Authorities of the Parties shall consult, at
times mutually agreed to by them, to promote the most effective use
of this Treaty.  The Central Authorities may also agree on such
practical measures as may be necessary to facilitate the
implementation of this Treaty.

Article 19
Application

This Treaty shall apply to any request presented after the
date of its entry into force, even if the acts or omissions
constituting the offense occurred before that date.

Article 20
Ratification, Entry Into Force, and Termination

1.   This Treaty shall be subject to ratification, and the
instruments of ratification shall be exchanged as soon as possible.

17

2.   This Treaty shall enter into force upon the exchange of the instruments of ratification.

3.   The Parties may amend this Treaty by mutual agreement, and any such amendment shall enter into force upon a written exchange of notifications between the Parties, through the diplomatic channel, that all domestic requirements for its entry into force have been completed.

4.   Either Party may terminate this Treaty by means of written notice, through the diplomatic channel, to the other Party. Termination shall take effect six months following the date of notification.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Treaty.

DONE at Brasilia, in duplicate, this   14th   day of October, 1997, in the English and Portuguese languages, both texts being equally authentic.

FOR THE GOVERNMENT OF THE
UNITED STATES OF AMERICA:

FOR THE GOVERNMENT OF THE
FEDERATIVE REPUBLIC OF BRAZIL:

18

**FORM A (For Use With Article 8)**

**CERTIFICATE OF AUTHENTICITY OF
BUSINESS RECORDS**

I, _____, attest on penalty of
                    (Name)

criminal punishment for false statement or false attestation that

I am employed by

_____
         (Name of Business from which documents are sought)

and that my official title is _____

    I further state that each of the records attached hereto is

the original or a duplicate of the original records in the

custody of _____
            (Name of Business from which documents are sought)

    I further state that:

A)    such records were made, at or near the time of the
occurrence of the matters set forth, by (or from
information transmitted by) a person with knowledge of
those matters;

B)    such records were kept in the course of a regularly
conducted business activity;

C)    the business activity made such records as a regular
practice; and

D)    if such record is not the original, such record is a
duplicate of the original.

_____          _____
    Signature                                    Date

Sworn to or affirmed before me.  _____,
                                                    (Name)

a _____ this
        (notary public, judge, judicial officer, etc.)

_____ day of _____ 19_____.

19

**FORM  B (For Use With Article 9)**

**ATTESTATION OF AUTHENTICITY OF FOREIGN PUBLIC DOCUMENTS**

I, _____, attest on penalty of
(Name)

criminal punishment for false statement or attestation that

my position with the Government of _____
(Country)

is _____, and that in that position I
(Official Title)

am authorized by the law of _____
(Country)

to attest that the documents attached and described below are

true and accurate copies of original official records which

are recorded or filed in _____,
(Name of Office or Agency)

which is a government office or agency of _____,
(Country)


Description of Documents:


_____
(Signature)

_____
(Title)

_____
(Date)

20

**FORM C (For Use With Article 14)**

ATTESTATION WITH RESPECT TO SEIZED ARTICLES

I, _____, attest on penalty of
               (Name)

criminal punishment for false statements or attestation that

my position with the Government of_____
                                (Country)

is _____. I received the articles
      (Official Title)

listed below from _____
                       (Name of Person)

on _____, at _____
        (Date)             (Place)

in the following condition:

Description of Article:

Changes in Condition while in my custody:

Official Seal

_____
         (Signature)

_____
         (Title)

_____
         (Date)